1

```
1            IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
2                      CENTRAL DIVISION

3

4   UNITED STATES OF AMERICA,    .
                                 . Docket No. 4:19-CR-00393-KGB-1
5   PLAINTIFF,                   .
                                 . Little Rock, Arkansas
6   VS.                          . September 21, 2020
                                 . 2:37 P.M.
7   DONNELL A. THOMAS,           .
                                 .
8   DEFENDANT.                   .
    . . . . . . . . . . . . . . .
9

10

11                       TRANSCRIPT OF

12          PRELIMINARY HEARING AND BOND HEARING

13         BEFORE THE HONORABLE PATRICIA S. HARRIS

14             UNITED STATES MAGISTRATE JUDGE

15

16

17

18  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Colleen DuBose

19

20  Transcription Service:           Robin Warbritton
                                     Post Office Box 262
21                                   Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

2

APPEARANCES:

For the Government:        Mr. Cameron Charles McCree
                          U.S. Attorney's Office
                          Eastern District of Arkansas
                          Post Office Box 1229
                          Little Rock, AR  72203-1229

For the Defendant:        Ms. Erin Cassinelli
                          Mr. Michael Kaiser
                          Lassiter & Cassinelli
                          813 West Third Street
                          Little Rock, AR  72201

3

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S WITNESSES: | | | | |
| Luther Hartwell | 8 | 18 | 51 | 52 |
| Keauna Smith | 58 | 59 | | |
| | | | | |
| DEFENDANT'S WITNESS: | | | | |
| Donnell Thomas | 64 | | | |

|  | IDENTIFIED | RECEIVED |
|---|---|---|
| EXHIBITS: | | |
| Government's Exhibit No. 1 | 15 | 16 |

4

1          P R O C E E D I N G S

2      (Call to order of the Court.)

3          THE COURT:  You may be seated.  Good afternoon.

4          MR. McCREE:  Good afternoon, Your Honor.

5          MR. KAISER:  Good afternoon, Judge.

6          THE COURT:  We are here for a bond hearing.  The case

7  is *United States v. Donnell A. Thomas*, 4:19-CR-00393-KGB.

8  Cameron McCree is here for the United States.

9          Erin Cassinelli and Mr. Kaiser are here for Mr.

10 Thomas.  Mr. Thomas is appearing by video conference from, I

11 think, Pulaski County.

12         Mr. Thomas, can you hear me?

13         THE DEFENDANT:  Yes, ma'am.

14         THE COURT:  All right.  And then, Keauna Smith is

15 appearing by telephone, is that correct, for Probation?

16         MS. SMITH:  Yes, Your Honor.

17         THE COURT:  Okay.  Very good.

18         And I didn't look back at the docket.  Is there a

19 notice or a consent about Mr. Thomas --

20         MS. CASSINELLI:  No, Your Honor, I was out of town

21 last week, so I didn't have an opportunity to address that

22 with him.

23         THE COURT:  Okay.  I'll do that.

24         MS. CASSINELLI:  Thank you.

25         THE COURT:  Mr. Thomas, the reason I'm asking about

1  that is you have a right to be here in person; however, as a

2  result of the COVID pandemic, we are holding as many hearings

3  as we possibly can by video conference to protect the

4  witnesses and other staff in the courtroom.  You can waive

5  that right to be here in person and consent to this hearing

6  being held by video conference.  Do you consent to the hearing

7  being held today by video conference?

8           THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.

9           THE COURT:  Okay.

10           THE DEFENDANT:  I'm okay with that.

11           THE COURT:  Okay.  Thank you.

12      Okay.  This is a -- Mr. Thomas was arrested related

13  to a petition to revoke his supervised release.  And as such,

14  the -- the burden of proof is on the defendant to prove that

15  he is not a risk of flight or not a danger to the community

16  based on the allegations.

17           So, you may proceed, Ms. Cassinelli or Mr. Kaiser.

18           MS. CASSINELLI:  Well, Your Honor, we also have the

19  preliminary hearing issue.

20           THE COURT:  Okay.

21           MS. CASSINELLI:  And, so, Mr. McCree and I discussed

22  it, and knowing that he's going to go through the video and

23  all that, we -- unless something has changed, I think we

24  thought it might be more expeditious if he just starts.

25           THE COURT:  That's perfectly fine with me.  And I --

1    I had forgotten you wanted a preliminary hearing as well.

2           MS. CASSINELLI:  Because I feel like otherwise we

3    would go back and forth a couple of times.

4           THE COURT:  That's fine.  And I don't ever have any

5    problem with the parties' counsel working out an agreement

6    like that ahead of time.

7           MS. CASSINELLI:  Thank you.

8           THE COURT:  And, so, Mr. McCree, the ball is in your

9    court.

10          MR. McCREE:  Thank you, Your Honor.  And, Your Honor,

11   do you mind if I may stay seated here so that Mr. Thomas can

12   hear me?

13          THE COURT:  I do not mind.  I think it's important to

14   be close to the mics so that Mr. Thomas can hear everything.

15   So, yes, you may stay seated.

16          And, Defense Counsel, you may remain seated as well

17   to be close to the mic unless you come up to the podium.

18          MS. CASSINELLI:  Thank you, Your Honor.  And I just

19   wanted to say for the record, I spoke with Mr. Thomas this

20   morning and he indicated that in prior experiences he's had a

21   little difficulty hearing --

22          THE COURT:  Okay.

23          MS. CASSINELLI:  -- and so I told him if he can't

24   hear us to give us a signal, that we won't be offended if he

25   interrupts us if we don't see him waving, and that if there is

1   anything that he needs to talk with me about that comes up,

2   that's emergent, you know, to let us know.

3          THE COURT:  Sure.

4          MS. CASSINELLI:  So, I know the Court wouldn't be

5   offended if he has to interrupt us to let us know.

6          THE COURT:  No.  And that's absolutely right.  Mr.

7   Thomas, if at any time you can't hear clearly what is

8   happening today, let us know.  It's very important that you

9   are aware of what's going on and this is a hearing about you,

10  so please feel free to interrupt the proceedings if you are

11  unable to hear what's happening.  Okay?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  Okay.  Very good.

14         MR. McCREE:  Your Honor, the United States calls

15  Luther Hartwell.

16         THE COURT:  Mr. Hartwell, you may come forward.  My

17  Courtroom Deputy will swear you in.  Just come up toward this

18  way.  She'll swear you in and then you'll take a seat here at

19  the witness stand.

20      (LUTHER HARTWELL, GOVERNMENT'S WITNESS, SWORN.)

21         THE COURT:  Okay.  You may be seated up here.  And,

22  Mr. Hartwell, be sure, when you sit, to pull the microphone as

23  close to your face as you can so that everybody can hear you

24  well.

25         THE WITNESS:  Okay.

1        THE COURT:  And you may have to scoot your seat up.

2                    DIRECT EXAMINATION

3    BY MR. McCREE:

4    Q   Yes, sir.  Will you state your name for the record,

5    please?

6    A   Luther Hartwell.

7    Q   And, Mr. Hartwell, what city and state do you live in?

8    A   Jacksonville, Arkansas.

9    Q   And am I correct and understand that there was a shooting

10   incident at your home on May 14th of 2020?

11   A   Yes.

12   Q   Okay.  And were you home that evening?

13   A   Yes.

14   Q   About what time of day did this shooting incident take

15   place?

16   A   About 10:30 at night.

17   Q   And where at your house did that incident take place?

18   A   Outside, in front of my house.

19   Q   That evening, who was home with you?

20   A   It was me and a couple of female ladies and --

21   Q   And -- I'm sorry about that.

22   A   -- there was a few people there.

23   Q   So you said it was you and a couple of female ladies and

24   who -- who are the other people that were there?

25   A   It was my brother-in-law and another guy.

Hartwell - Direct                                                9

1   Q   Who is your brother-in-law?

2   A   Franklin Hinton.

3   Q   And who is the other guy that you were referencing?

4   A   His name was -- I don't recall his -- his full name.  Buck

5   is what he go by.

6   Q   Buck is his name?

7   A   (No audible response.)

8   Q   And during that evening, did you ever have any encounters

9   with Mr. Thomas?

10  A   Yes.

11  Q   When did Mr. Thomas come into the picture?

12  A   He came and visited me.

13  Q   So he was there that night too?

14  A   For a brief moment.

15  Q   Okay.  And do I understand that your home has a video

16  surveillance system?

17  A   Yes, sir.

18  Q   And did you review that video surveillance system?

19  A   Yes, sir.

20  Q   And, to your knowledge, did the video surveillance system

21  capture the shooting incident at your home on May 14th?

22  A   Yes, sir.

23  Q   Okay.  And before this hearing, you and I talked for about

24  five minutes; is that right?

25  A   Yes, sir.

1  Q   And you looked at a few different videos that I have on a

2  CD; is that correct?

3  A   Yes, sir.

4  Q   And there were -- I believe there were six videos that we

5  looked at; is that right?

6  A   Yes, sir.

7  Q   And five of them came from your -- your DVR system?

8  A   Yes, sir.

9  Q   And then there was a sixth video that you didn't know what

10 it covered; is that right?

11 A   Right.

12 Q   Okay.

13        MR. McCREE:  And, Your Honor, if I could have

14 permission to move freely about the courtroom?

15        THE COURT:  You may.  Just speak up so that Mr.

16 Thomas can hear you.

17        MR. McCREE:  Yes, Your Honor.

18        THE COURT:  Is it going to come up, Colleen?

19        THE COURTROOM DEPUTY:  I'm not sure.  I'm going to --

20 I've messaged I.T.  Sorry.

21        MR. McCREE:  Okay.  And, Your Honor, I have a few

22 more questions for him if --

23        THE COURT:  Go ahead.  Yes.

24        MR. McCREE:  Okay.

25 BY MR. McCREE:

1   Q   So, Mr. Hartwell, we were talking about a shooting

2   incident that happened at your home on May 14th of 2020.  And

3   do I understand correctly that you were inside the home when

4   the gunshot was fired; is that right?

5   A   Yes, sir.

6   Q   Did you hear the gunshot?

7   A   Yes, sir.

8   Q   Okay.  Before the gunshot was fired, the people you listed

9   earlier, you said there were a number of people who were at

10  your home that night, were all those people still inside your

11  home when the gunshot was fired?

12  A   Yes, sir.

13  Q   So, does that include Mr. Thomas and Mr. Hinton?

14  A   No, sir.

15  Q   All right.  So, Mr. Thomas and Mr. Hinton were not inside

16  when the gunshot was fired?

17  A   No, sir.

18  Q   Do you know if they had any contact with one another

19  before the gunshot was fired?

20  A   They were talking.

21  Q   All right.  And did you see them leave your home?

22  A   Yes, sir.

23  Q   Did they leave together?

24  A   Yes, sir.

25  Q   What were they talking about doing when they left?

                        Hartwell - Direct                      12

1   A    I don't know what they were talking about.

2   Q    Do you know where they were headed?

3   A    Outside.

4   Q    Okay.  And after the shooting incident, did you look at

5   the video?

6   A    Yes, sir.

7   Q    Okay.  And, so, is it fair to say that you -- you heard

8   the gunshots, you saw Mr. Thomas and Mr. Hinton together, you

9   didn't see the shooting itself; is that right?

10  A    No, sir.

11  Q    But you saw what was on the video?

12  A    Yes, sir.

13  Q    Okay.  And based on what you saw on the video, who was the

14  person holding the gun in the video?

15        MS. CASSINELLI:  Your Honor, I object.  I think the

16  video speaks for itself.

17        THE COURT:  And I know we're going to watch it, and I

18  think he -- I think Mr. Hartwell can -- because of his

19  personal knowledge of the two individuals in issue, can

20  identify what he saw on the video.  So I'll overrule your

21  objection.

22        You can answer the question, Mr. Hartwell.

23        THE WITNESS:  Can you repeat the question?

24  BY MR. McCREE:

25  Q    Based on your review of the video, did you see anyone

Hartwell - Direct                                          13

1  holding a gun?

2  A    Yes, sir.

3  Q    Who did you see holding a gun?

4  A    Donnell.

5  Q    And is that Donnell Thomas, the defendant in this case?

6  A    Yes.

7  Q    How do you know Mr. Thomas?

8  A    He used to live across the street from me.

9  Q    Okay.  How long have you known him?

10  A    About a year.

11         MR. McCREE:  And, Your Honor, I believe my remaining

12  questions will concern the video.

13         THE COURT:  Okay.

14         MR. McCREE:  Okay.

15         THE COURT:  Can you all see the screen?

16         MS. CASSINELLI:  Yes.  It -- yes.

17         THE COURT:  Is there any way to move the screen

18  closer so that Mr. -- closer to Mr. Thomas, but to where the

19  defense attorneys can see it?

20         MS. CASSINELLI:  I can get up and move if need be.

21         THE COURT:  Okay.  Well, I just want to --

22         THE COURT I.T. SPECIALIST:  That's a good question.

23         THE COURT:  Yeah, I don't -- can you see the screen,

24  Mr. Thomas, with the video on it?

25         THE DEFENDANT:  I can -- I can see it -- I can see it

Hartwell - Direct                                    14

1   a little bit, ma'am.

2          THE COURTROOM DEPUTY:  Also, Keauna said she cannot

3   hear the witness.

4          THE COURT I.T. SPECIALIST:  Who can't?

5          THE COURTROOM DEPUTY:  Probation.

6          THE COURT:  It's probably because he's speaking real

7   quietly.

8          THE COURT I.T. SPECIALIST:  Yeah, he was real soft.

9   I was pulling up the audio.  The only way to really get it to

10  where he can really see it is if I can move it like right

11  here.

12         THE COURT:  Okay.

13         THE COURT I.T. SPECIALIST:  Do you want me to go

14  ahead and do that?

15         THE COURT:  Ms. Cassinelli, I'll let you make the

16  call on that.

17         MS. CASSINELLI:  Oh.

18         THE COURT I.T. SPECIALIST:  Unfortunately, the -- we

19  might can move the web cam where I can position it towards --

20         MS. CASSINELLI:  Well, I -- I can -- Mr. Thomas, I

21  believe, has seen the videos as best we could make that

22  happen.

23         THE COURT:  Okay.

24         MS. CASSINELLI:  And I -- Mr. Thomas, I'm going to --

25  for probably the only time that I represent you, I'm going to

1   tell you that you can say something to me in front a courtroom

2   full of people.

3         THE DEFENDANT:  Okay.

4         MS. CASSINELLI:  Are you okay with them leaving that

5   over there, if I'm here to kind of tell you what's going on?

6         THE DEFENDANT:  Yes, ma'am.  I already have saw it.

7         MS. CASSINELLI:  Okay.  So, I think we're okay.

8   Thank you, Judge.

9         THE COURT:  Okay.  And, Mr. Hartwell, I know you're

10  going to be asked some questions about the video, speak up if

11  you could, because you're pretty soft spoken, and we need to

12  be able to hear you.  Thank you.

13        MR. McCREE:  And, Your Honor, when we're looking at

14  the video, and there are -- and that's been marked as

15  Government's Exhibit 1, and there are a number of videos on

16  that.  So, this particular one is 202R, to discern it from the

17  others.

18     (Government's Exhibit No. 1 identified.)

19        THE COURT:  Okay.

20        MR. McCREE:  And we're about at the 15:20 mark of the

21  video.  And there is just a short period of that I want to

22  show to Mr. Hartwell.

23        THE COURT:  Okay.

24        MS. CASSINELLI:  No objection to admission of the

25  video.

Hartwell - Direct                                   16

1          MR. McCREE:  Okay.

2          THE COURT:  Are you offering it into evidence?

3          MR. McCREE:  Yes, Your Honor.

4          THE COURT:  I'll accept it as Exhibit 1.

5     (Government's Exhibit 1 received.)

6  BY MR. McCREE:

7  Q   And, Mr. Hartwell, you looked at this video earlier.  This

8  is from the night of the shooting; is that correct?

9  A   Yes, sir.

10 Q   Okay.

11 A   Yes, sir.

12 Q   Mr. Hartwell, can you see the video from there?

13 A   Yes, sir.

14 Q   And I believe the shooting incident is up in the top left

15 corner; is that right?

16 A   Yes, sir.

17 Q   It was around the 15:31 mark you saw the flash, and then

18 there's two people running that we're looking at right now?

19          THE COURT:  Can you -- can you do that again?

20          MR. McCREE:  Yes, Your Honor.

21          THE COURT:  Sorry.  If it would help you to go closer

22 to the video?

23          THE WITNESS:  It's fine.  I can see.

24          THE COURT:  Okay.  Okay.

25 BY MR. McCREE:

1  Q    So, Mr. Hartwell, we're at about the 15:31 mark, and I

2  believe there would be a flash here, correct?

3  A    Yes.

4  Q    And who is this running that we're looking at?

5  A    It's Franklin Hinton and Donnell Thomas.

6  Q    So, who was the first person that we saw running?

7  A    Franklin Hinton.

8  Q    Okay.  The individual we're looking at now.  The

9  individual who just ran towards the car, who is that

10  individual?

11  A    Donnell Thomas.

12  Q    I believe there you see him holding a gun; is that right?

13  A    Yes.

14  Q    And that's around the 15:37 or 40 or so mark?

15  A    Pardon me?

16  Q    A little bit around the 15:37 or 15:40 mark or so, that's

17  -- you're talking about there Mr. Thomas has a gun?

18  A    Yes.

19  Q    Okay.  So, you told me earlier that you were inside the

20  house when the shooting happened.  Did you see Mr. Hinton

21  after the shooting?

22  A    Yes.

23  Q    Was he injured?

24  A    Yes.

25  Q    What kind of injury did he have?

Hartwell - Direct/Cross                                    18

1   A   Gunshot to the leg, down there.

2   Q   Did he have to go to the hospital for that?

3   A   Yes, he did.

4   Q   Okay.  So, based on your -- what you heard when the

5   gunshot -- what you heard inside the house and what you saw on

6   the video, do you believe that Mr. Hinton was shot?

7   A   Yes.

8   Q   And that Mr. Thomas shot him?

9   A   Yes.

10          MR. McCREE:  Your Honor, I don't have anything

11   further.

12          THE COURT:  Okay.  Ms. Cassinelli or Mr. Kaiser, you

13   may cross examine the witness.

14          MS. CASSINELLI:  I'm trying to think of what would be

15   easier.  I think I'll try to stay right here if that's okay

16   with the Court.

17          THE COURT:  Okay.  Just be sure to speak into the mic

18   if you can.

19          MS. CASSINELLI:  Okay.  Actually, let me start with

20   the video since we've got that cued up.

21          THE COURT:  Okay.

22                      CROSS EXAMINATION

23   BY MS. CASSINELLI:

24   Q   Okay.  We're at 14:30.  Mr. Hartwell, are you with me; are

25   you looking at the video?

Hartwell - Cross                                    19

1   A   Yes, ma'am.

2   Q   All right.  I think it was just your testimony that at

3   around 15:31, which we're about 30 seconds from, this is where

4   you -- you identified Mr. Thomas; is that right?

5   A   Yes.

6   Q   From this video right here?

7   A   And Franklin.

8   Q   And -- and you can see that?

9   A   Yes.

10  Q   Okay.  And then, at 15:40, which is going to be in about

11  30 more seconds, it was your testimony that this was the basis

12  for your statement that you saw Donnell Thomas with a gun; is

13  that right?

14  A   No, when he got out of the car.

15  Q   In about eight seconds, so, right there, that's -- it's

16  your testimony that you can see Donnell Thomas in that video

17  with a gun?

18  A   On video.  Right.  Yes.

19  Q   Okay.  I just said I was going to sit at the table.  All

20  right.  Mr. Hartwell, have you -- did you review any other

21  parts of the videos before you testified today?

22  A   A couple of -- he showed me a couple of videos.

23  Q   But were you able to watch it beginning to end or --

24  A   No.

25  Q   Okay.  Do you remember talking to the police that day when

1  they came to the house?

2  A    Yes.

3  Q    And when they got there, I believe you and Mr. Hinton were

4  sitting -- sitting at your kitchen table; is that right?

5  A    Yes.

6  Q    Okay.  And you didn't call 9-1-1; is that correct?

7  A    No, somebody else called.

8  Q    Okay.  And the girls that you mentioned had already left,

9  I think, right before that?

10 A    Yes.

11 Q    So, they actually weren't there to witness anything?

12 A    No.

13 Q    But they would have been there to witness Mr. Thomas

14 coming over and visiting your house, right?

15 A    Yes, that's -- they -- they were there, yeah, they saw Mr.

16 Thomas come in.

17 Q    But, that's not anywhere in the incident report, right?

18 A    Well, I did tell them that some ladies was there.

19 Q    And I think you said someone named Buck?

20 A    The man's name that called 9-1-1.

21 Q    Oh, someone named Buck called 9-1-1?

22 A    Well, that's what he -- his nickname is Buck.

23 Q    Well, who is he?

24 A    He was from out of town with me.  He came back from -- he

25 brought me back from Biloxi, Mississippi.  And he was sort of

1  staying there.

2  Q    But you don't know his name?

3  A    Well, I can't think of his name.  I'm just --

4  Q    Well, why is he not listed in any of the documents

5  associated with the case, the incident report; you never

6  mentioned that there was another guy in your home?

7  A    Well, the police interviewed him.

8  Q    Then they didn't put in the incident report.

9         MR. McCREE:  Your Honor, I don't believe the incident

10 report is Mr. Hartwell's statement, and I've not shown the

11 incident report to him, so I don't know that it's fair to him

12 to say that the person is listed or not listed, particularly

13 if he doesn't know the person's legal name.

14        MS. CASSINELLI:  May I approach?

15        THE COURT:  You may.  Yeah, show him, because I'm

16 assuming that he -- and you can ask him, but I'm assuming he

17 doesn't know what's in the incident report.

18        MS. CASSINELLI:  Okay.

19 BY MS. CASSINELLI:

20 Q    Take a moment -- take all the time you need, really, and

21 review that; in particular, your interview.

22 A    I don't have my glasses.  I'm sorry.

23        THE COURT:  He needs some glasses.

24 BY MS. CASSINELLI:

25 Q    Will these help?

1  A   Yes.

2  Q   I don't know if they would or not, but you're welcome to

3  try them.

4      (The witness reviews the document.)

5          THE WITNESS:  Okay.

6  BY MS. CASSINELLI:

7  Q   Did you have a chance to review that?

8  A   Yes, ma'am.

9  Q   Okay.  Thank you for taking the time.  Do you agree with

10  me that there is no mention of another person, another male at

11  the residence named Buck?

12  A   Yes.

13  Q   Okay.  And you did probably notice that the women that you

14  mentioned, I think somebody came to pick up Ms. Campbell from

15  your residence --

16  A   Audrey.

17  Q   -- right before this; is that right?

18  A   Yes.

19  Q   Okay.  And that is in there, and she's listed as a witness

20  on the report, right?

21  A   Yes.

22  Q   Okay.

23          MS. CASSINELLI:  I'm going to have to come up here,

24  Your Honor.  I'm sorry.

25          THE COURT:  No, that's perfectly fine.

1          MS. CASSINELLI:  Do you want me to wear a mask at the

2    podium?

3          THE COURT:  You don't -- whatever you feel

4    comfortable with.

5          MS. CASSINELLI:  I don't want anybody to feel

6    uncomfortable.

7          THE COURT:  No, I'm --

8          MS. CASSINELLI:  You're safe up there, I think.

9          THE COURT:  I think -- I think we're all sufficiently

10   apart.

11         MS. CASSINELLI:  Okay.  Thank you.

12         THE COURT:  Yes.

13   BY MS. CASSINELLI:

14   Q   All right.  So, nobody -- nobody mentions Buck.  How about

15   what side of the car does Mr. Thomas get into on that video?

16   A   He gets in -- Mr. Thomas?

17   Q   Uh-huh.

18   A   He gets in the -- the passenger's side.

19   Q   Okay.  Who is driving?

20   A   I don't know.

21   Q   You have no idea?  You didn't meet the driver?

22   A   Well, I vaguely saw him.

23   Q   Did you notice in the incident report that you never

24   mentioned another person that was with Mr. Thomas?

25         MR. McCREE:  And, Your Honor, I'm going to object to

1  that.  The incident report is the officer's summary about what

2  Mr. Hartwell said, not Mr. Hartwell's summary.

3          THE COURT:  I think -- I think the better way to say

4  it is that he -- not that he didn't mention it, but that the

5  police report didn't mention it.

6          MS. CASSINELLI:  Yes, Your Honor.

7  BY MS. CASSINELLI:

8  Q   Mr. Hartwell, did you notice in the incident report that

9  the officer purported to recount -- purported to summarize

10 what you told them?

11 A   Pardon me?

12 Q   Did you notice in the incident report that there is a

13 section that describes what you told them?

14 A   Yes.

15 Q   Okay.  And is it accurate that the incident report does

16 not mention that Mr. Thomas was with anyone else?

17 A   Yes.

18 Q   In fact, there is no mention whatsoever of a driver or any

19 other human being being there, right?

20 A   Yes.

21 Q   And, so, you say you don't know who the driver was.  And

22 did you say you didn't see him?

23 A   I said I didn't know who he was.

24 Q   And you never asked?

25 A   I mean --

1  Q    You weren't introduced to him?

2  A    No.

3  Q    Did you speak to him?

4  A    From a distance.

5  Q    What kind of distance?

6  A    Well, when I answered the door, and as he was going back

7  getting in the car, we said stuff.

8  Q    So, he also came in your house?

9  A    No, he didn't come in my house.

10 Q    He just came to the door?

11 A    No, he didn't come to the door.  He just was sitting in

12 his vehicle.

13 Q    On the street?

14 A    Yes.

15 Q    So, from your house to the street is as close as you got

16 to him?

17 A    No, I kind of walked in my -- in my front yard.

18 Q    You kind of walked in your front yard, so maybe you saw

19 him from halfway between your house and your -- and the car?

20 A    Yeah.

21 Q    And that's all the contact you had with him?

22 A    Yes, ma'am.

23 Q    Okay.  Let's --

24         MS. CASSINELLI:  Your Honor, there's a little --

25 there's two videos that dovetail.

1            MR. McCREE:  I can unlock it.

2            MS. CASSINELLI:  Well, we've got to watch -- I guess

3    we have to watch one at time.  I don't know how else to do,

4    like, you know, we -- we were able to put them side by side so

5    we could match the time stamps, so you can see the -- you

6    know, it's like one is up at the house and one is out at the

7    street.

8            THE COURT:  Okay.

9            MS. CASSINELLI:  So, I guess we may have to go

10   through and just mark our times and then go to the other video

11   to --

12           THE COURT:  Perfectly fine.

13           MS. CASSINELLI:  It's just difficult.

14           THE COURT:  I know.

15           MS. CASSINELLI:  Let's -- let's -- can we start with

16   the other one?  I think it's number three.  Thank you.

17           MR. McCREE:  It's up.

18           MS. CASSINELLI:  Thank you.

19           THE COURT:  Mr. Hartwell, I know you haven't looked

20   at all of these.  If you need to get closer to the screen, let

21   me know and I'll let you do that.

22           THE WITNESS:  Thank you.

23           MS. CASSINELLI:  Don't let me break your computer.

24      (Laughter in the courtroom.)

25           MS. CASSINELLI:  Because I'm like, you know, I just

1   keep clicking until something happens.  Oh, thank you.

2           MR. McCREE:  You're welcome.

3   BY MS. CASSINELLI:

4   Q   Okay.  So, it starts out at about 10:20 p.m., and I'm

5   going to fast-forward a few minutes because it's just sort of

6   nothing is on there for a few minutes.  Okay.  So, Mr.

7   Hartwell, as people start showing up in this video, I want you

8   to tell us who everybody is.  And before we get to that part,

9   is this your front stoop?

10  A   Yes.

11  Q   That's your front door?

12  A   Yes.  Yes.

13  Q   And, so, the street is that way?

14  A   Yes.

15  Q   Okay.  So, if I was looking straight at your front porch,

16  I would turn all the way around to see the vehicle that we're

17  talking about?

18  A   Well -- yes.  Yes.

19  Q   Like your porch would be here, the vehicle would be here?

20  A   Yes.  Yes.

21  Q   Okay.  I think it's funny how slow a minute is here.  I

22  keep thinking it's going to come any second, but.  Let me ask

23  you this before we get going.  I just want to make this

24  easier.  What did Mr. Thomas do when he came to your house?

25  A   Well, he spoke, and came on in -- came in and -- and, like

1    I said, I had company that night, so he spoke to everybody,

2    and then he left.

3    Q   What -- what kind of conversation did you all have?

4    A   Well, you know, I mean, "Hey, what's going on?  What you

5    doing?  Playing dominoes."

6    Q   Had you talked to him earlier in the day?

7    A   Yes, he came over twice.

8    Q   Oh, he came over earlier in the day?  When was that?

9    A   About an hour before the shooting.

10   Q   What was -- what was the reason for that visit?

11   A   That's what it was, just to see what was going on.

12   Q   And he left and came back an hour later?

13   A   Yeah.

14   Q   I didn't see that mentioned in the incident report, did

15   you?

16   A   No, I didn't.

17   Q   Did you provide investigators the video of that prior

18   visit?

19   A   Yes, that, right there.

20   Q   You think it's on there?

21   A   I know it is.

22   Q   From hours prior?

23   A   Yes.

24   Q   Huh.  Had you seen him any other time that day?

25   A   No.

1   Q    Because you saw him in the neighborhood right around that

2   same time, right?

3   A    Well, I saw him two times that day.

4   Q    But, let's --

5   A    (Indiscernible.)

6   Q    -- let's say in that few day time period, you had seen him

7   in the neighborhood, right?

8   A    I hadn't seen him in a while.

9   Q    And, so, that day, he just popped over a couple of times?

10  A    Yes, ma'am.

11  Q    Total surprise?

12  A    Well, that's what he always -- he used to live across the

13  street.

14  Q    That was a year ago, right?

15  A    Yes.

16  Q    So, after a whole year, he just pops in twice in one day?

17  A    Well, no, he used to come by regularly.  Well, he used to

18  come by about once a -- once a month just to speak, say what's

19  going on.

20  Q    Okay.  And how long do you think he was there?

21  A    Probably about ten minutes.

22  Q    Okay.  And you say he -- did he just come in and speak and

23  then leave?

24  A    Well, just -- yeah.

25  Q    I mean, yes?

1   A    Yes.

2   Q    And why did he leave?

3   A    Well, I don't know.  I guess he -- I don't know.  That's

4   why he came down, obviously.

5   Q    But you still had guests over, right?

6   A    Yes, ma'am.

7   Q    Do you remember telling the police that you -- he came in

8   and you told him you were going to bed and he needed to leave?

9   A    I probably did.

10  Q    You agree that's what the incident report says you said?

11  A    Yes, ma'am.

12  Q    Okay.  And you also testified, I believe, that you were

13  inside when the shooting occurred; is that right?

14  A    Yes, ma'am.

15  Q    And you -- you, I believe, told police that you had shut

16  the door to your bedroom already when you heard the shot?

17  A    Yes, ma'am.

18  Q    What else did Mr. Thomas do while he was there, anything

19  else?  He came in.  You spoke.  You said it's time to go, I'm

20  going to bed, and he left?

21  A    Well, he was talking to my company.

22  Q    And you didn't know what they were talking about, right?

23  A    No.

24  Q    And then, at some point, you see -- allegedly see Mr.

25  Thomas and Mr. Hinton walk out front together?

1  A   Yes.

2  Q   But you stayed in the house?

3  A   Well, yes.

4  Q   Okay.  I'm going to play the video starting at 10:26:20.

5  Who is this on the video?

6  A   Donnell.

7  Q   Okay.  He's at your front door, right?

8  A   Yes.

9  Q   He's alone, right?

10 A   Yes.

11 Q   That's the lights from a different car.  You may not know

12 that, but.  Okay.  So, now he's inside, right?  That was

13 10:27:37-ish, or, no, 20 -- around the 20 mark.  Okay.  Who is

14 this?

15 A   That's Donnell leaving, talking.

16 Q   Okay.  Well, what's he -- what's he got in his hand; can

17 you see?

18 A   No.  No, ma'am.

19 Q   Does it look like a beer?  Do you see that?

20 A   Yeah.

21 Q   Or some kind of drink?  I probably shouldn't assume beer,

22 but, you know.

23          MR. McCREE:  Your Honor, I believe the testimony --

24          THE COURT:  Did you -- go ahead.

25          MR. McCREE:  I believe the testimony was that the

1    witness does not know what he had in his hand.

2            THE COURT:  Did you know what he had in his hand?

3            THE WITNESS:  No, it -- it was nothing, it probably

4    was a beer.  I mean, it's no weapon or anything.

5            THE COURT:  Okay.

6    BY MS. CASSINELLI:

7    Q   Well, I mean, I figured if you could see a gun in the

8    distance, you could probably tell what that was.

9            MR. McCREE:  Your Honor, I don't believe that's a

10   question.  I think the reason he knew it was gun was because

11   Mr. Hinton was shot.

12           MS. CASSINELLI:  Well, that wasn't his testimony.

13           THE COURT:  All right.

14           MS. CASSINELLI:  Okay.

15   BY MS. CASSINELLI:

16   Q   So, let's go.  I want you to tell me who comes out next.

17   A   Me, Luther.

18   Q   That's you?

19   A   Yeah.

20   Q   Okay.  That's at 10:27:45.  What are you doing right here?

21   A   I'm standing on my porch, just --

22   Q   Well, you pull your shirt up, and you do something in the

23   front of your pants, and you let your shirt back down.  What

24   -- what were you doing?

25   A   Well, I wasn't urinating.

1   Q   Well, I didn't think you were doing that.  Even I wasn't

2   going to go that far.  You don't remember what you were --

3   A   I probably was just pulling --

4   Q   -- doing in your pants?

5   A   -- pulling up my pants, probably.

6   Q   It looked like you were maybe putting a firearm in there?

7   A   No, ma'am.

8   Q   No?  Okay.  There you go, so now you're going out towards

9   the car on the street, right?

10  A   Yeah.  Like I said, I -- I went in my -- I was in my yard.

11  Q   In your yard.  Right.  Okay.  Who is that?

12  A   That's me going back in the house.

13  Q   Okay.  And that's at 10:29:13-ish.  Who is this?

14  A   That is Frank, my brother-in-law.

15  Q   Well, there's two people there.  Who is in front?

16  A   Me.

17  Q   Okay.  So, that's you and Mr. Hinton at about 9:35 into --

18  9 minutes and 32 seconds into the video.  And I didn't look at

19  the time stamp.  You didn't mention a moment ago, or in the --

20  or to the police that you had gone in and out of the house

21  multiple times?

22  A   Well, I was just outside, and basically I was -- he asked

23  to speak to Frank, so I went and got Frank and told him

24  somebody wanted him.

25  Q   And, so, you -- right now, you and Mr. Hinton have been

1    outside for a while, and you're out of frame, so you're

2    outside of this part of your yard, towards the street, right?

3    A    Yes.

4            MS. CASSINELLI:  I'm sorry, Your Honor.  They're just

5    close enough that fast-forwarding doesn't work, but.

6            THE COURT:  It's okay.  It's not a problem.

7            MS. CASSINELLI:  Like I really want to hit that fast-

8    forward button, but then we'll just be trying to find the spot

9    again.

10           THE COURT:  I know.

11   BY MS. CASSINELLI:

12   Q    Okay.  Who is this?

13   A    That's Franklin.

14   Q    That's 10:31:28.  And, so, that's Mr. Hinton going inside

15   your house?

16   A    Yes.

17   Q    And you're not with him, right?

18   A    No, I'm standing in the yard.

19   Q    Okay.  Who is this?

20   A    That is me.

21   Q    And?

22   A    And Donnell.

23   Q    Okay.  You -- while we're waiting on this, you were not

24   able to describe the car; is that right?

25   A    No, ma'am.

Hartwell - Cross                                               35

1    Q    Okay.  I'm just trying to think of things we can do while

2    we're waiting.  So, right now, you all are all in the house,

3    right?

4    A    Yes.  Like I said --

5    Q    Having gone in and out a couple of times?

6    A    (No audible response.)

7    Q    Okay.  Who is this?

8    A    That's Donnell.

9    Q    Again, with something in his hand, a cup of some kind?

10   A    Yes.

11   Q    Who is that?

12   A    Donnell coming back.

13   Q    14 -- or at 10:34:30.  Who is that?

14   A    That's Franklin.

15   Q    And somebody is holding open the door; who is that?

16   A    That must be me.

17   Q    Okay.  So, you're standing with the door open, looking

18   out, right?

19   A    Yes, ma'am.

20   Q    And it shuts at 10:35:28 -- 20 -- no -- 31, 10:35:31,

21   right around there; do you agree?

22   A    Yes, ma'am.

23   Q    So, you're standing at your door until that time?

24   A    Yeah.  Yes, ma'am.

25   Q    All right.

1          MS. CASSINELLI:  I flubbed it up.

2          MR. McCREE:  You can go back to the file, the other

3    one is open.

4    BY MS. CASSINELLI:

5    Q    Okay.  We kind of have to match these up.  So this is --

6    or am I correct, Mr. Hartwell, that we're looking now as if we

7    were standing on your front porch, looking out, so this is the

8    street in front of your house?

9    A    Yes.

10   Q    Right?  And this is where you allege that the car -- the

11   shooter's vehicle was?

12   A    Yes.

13   Q    Is that the vehicle?

14   A    Yes.

15   Q    This vehicle, do you know what this vehicle looks like?

16   This vehicle is about to pull away.  It's not the vehicle.

17          THE COURT:  Do you know?

18          THE WITNESS:  I -- it's there -- it -- let me see.

19   BY MS. CASSINELLI:

20   Q    Who is that parked in front of your house right then, just

21   minutes before this?

22   A    Just minutes before that.  It -- okay, that's a white van

23   in the driveway.  I know they came --

24   Q    We know that's the girl -- the friend's -- the girl's

25   friend who came to get her?

1   A    The front car is Buck's.

2          THE COURT:  Can you say that again?

3          THE WITNESS:  The front car in the driveway is the

4   guy who brought me from -- from Mississippi.  The other car

5   had to be -- it had to be the car Donnell was in.

6   BY MS. CASSINELLI:

7   Q    Well, it just pulled away?

8   A    And that was at what time?

9   Q    10:21.  I'll save you the suspense and we'll fast-forward

10  a couple of minutes, because nothing is going to happen.

11         MR. McCREE:  Your Honor, just for clarity, when I was

12  giving time stamps, I was giving the time stamp on the -- the

13  video program, not the time stamp that the video has on it.

14         THE COURT:  Yeah, that's --

15         MS. CASSINELLI:  And I kind of have both, because

16  sometimes it was easier to do one way, and sometimes the

17  other, but I have them written down, so if we need to look

18  back, we can probably --

19         THE COURT:  Yeah.

20         MR. McCREE:  Yeah, I think, just clarity about what

21  the time stamps is referring to.

22         THE COURT:  Yeah.  Maybe we could refer to both.

23         MS. CASSINELLI:  This will be five minutes and about

24  42 seconds into the video when the next car pulls up.

25         THE COURT:  Okay.  So, this is like ten minutes

1  before -- or before the shooting incident?

2          MS. CASSINELLI:  So, yes, this video goes to the same

3  time frame of the other one.

4          THE COURT:  Okay.

5          MS. CASSINELLI:  It's just -- it's hard because

6  you're not looking at them side by side, you know.

7          THE COURT:  Okay.

8          MS. CASSINELLI:  But, if the Court will recall kind

9  of when we saw people coming in and out, then you can match it

10 to who is walking across the yard to the car -- or I should

11 say you can match it to who you think it is.

12         THE WITNESS:  I know who that was.

13 BY MS. CASSINELLI:

14 Q   Sure.  Sure you do.  Did you say Mr. Hinton is your

15 brother-in-law?

16 A   Yes.

17 Q   Does he live with you?

18 A   No, ma'am.

19 Q   Where does he live?

20 A   In Fayetteville somewhere.

21 Q   He lives in Fayetteville?

22 A   I mean, down at Fort Smith, yeah.  He --

23 Q   Northwest Arkansas?

24 A   He used to live with me.

25 Q   With you?

1  A    And my wife.

2  Q    Your wife lives there?

3  A    Not no more.  She passed.

4  Q    Oh, I'm sorry to hear that.  So, is it just you living

5  there right now?

6  A    Yes.

7  Q    Or I should not say right now.  I should have said as of

8  May 14th of this year.

9       Do you know if that's the car?

10          THE COURT:  What car?

11 BY MS. CASSINELLI:

12 Q    Is that the car that Mr. Thomas arrived in?

13 A    I mean, I can't see what kind of car that is.

14 Q    But you could see a face?

15 A    Well, when he get out and start walking towards my house,

16 I can.

17 Q    Uh-huh.  Who do you believe this to be?

18 A    Donnell.

19          THE COURT:  What time is that?

20          MS. CASSINELLI:  I'm sorry.  This is 10:26 forty and

21 about six minutes, and probably around 40 seconds into the

22 video -- nope, six minutes, 37 seconds.

23 BY MS. CASSINELLI:

24 Q    Okay.  So, do you agree with me that this is the driver's

25 side, that the driver's side of the car is facing your house,

Hartwell - Cross                                    40

1    so the car is facing that direction, right?  That's why you

2    said he just got out on the other side, that was the

3    passenger's side?

4    A    Yes.

5    Q    So, these would be headlights, taillights?

6    A    Yes.

7    Q    Okay.  Okay.  Who is that?

8    A    (Indiscernible, mumbling.)

9    Q    That's at about 10:27:41, somebody walks out and stands by

10   the driver's side of that car, right?

11   A    Okay.  They're standing by the driver's side of the car?

12   Q    Do you see him?

13   A    Yeah, I saw him.  I saw him come out.

14   Q    Who is that?

15   A    Donnell.

16   Q    Okay.  Do you see this person?

17   A    Okay.  One of those is me.  I did come out in the yard.

18   Q    Here you are standing by the driver's side door?

19   A    Okay.

20   Q    Right?

21   A    Yeah.  I didn't realize I came that close.

22   Q    Yeah.

23   A    Probably did, to see who -- who was out there.

24   Q    So, you're now standing with Mr. Thomas at the driver's

25   side door?

1  A    Uh-huh.

2  Q    Right?  That's what you just said, right, right here?  And

3  we know that because --

4  A    Okay.

5  Q    -- we can look at the other video, right, and see you

6  walking out and towards the car?

7  A    Okay.  That was Franklin -- that was me and Franklin.

8  Q    That was -- what was you and Franklin?

9  A    That was me and Franklin standing by -- out there.

10 Q    Okay.

11 A    Yeah.

12 Q    Now you've walked back in the house.  We missed that.  Did

13 you see that?

14 A    Yeah, I saw me walk back in the house.

15 Q    Okay.

16      MS. CASSINELLI:  I didn't do it, I swear.  Your

17 Honor, do you have another hearing scheduled?

18      THE COURT:  At 3:30.

19      MS. CASSINELLI:  I anticipate that this one is going

20 to take a bit.  Do you want us to --

21      THE COURT:  That other hearing is going to take just

22 a very short time.

23      MS. CASSINELLI:  I'm happy to take a break if they

24 want to go ahead and knock it out, if that's okay with

25 counsel.

Hartwell - Cross                                    42

1        THE COURT:  Let's go until 3:30, and then we'll --
2   can we do that?
3        THE COURTROOM DEPUTY:  (Indiscernible.)
4        THE COURT:  Okay.  If you need to -- I'll have you
5   let them know.  Yeah.  We'll do that.  Okay.
6   BY MS. CASSINELLI:
7   Q   All right.  So, I think you just walked back to the house.
8   We've still got who you think is Mr. Thomas standing by the
9   car, right?
10  A   No, Franklin.
11  Q   You think that's --
12  A   I think that --
13  Q   -- Mr. Hinton talking to the driver?
14  A   Yeah.
15  Q   Okay.
16  A   And me.  No, that's Mr. Hinton right there, coming out to
17  the car.
18  Q   Right here?  So, we've got --
19  A   Yeah.
20  Q   -- one, two, three people?
21  A   Well, that's me, Mr. Hinton, and Donnell.
22  Q   And talking to the driver?
23  A   Talking to the driver.
24  Q   But you don't know who it is?
25  A   No, ma'am, I don't.

Hartwell - Cross                                        43

1   Q   Mr. Hinton told police that he didn't know who shot him;

2   isn't that right?

3   A   I don't know.

4           MR. McCREE:  Your Honor --

5   BY MS. CASSINELLI:

6   Q   Weren't you sitting there?

7   A   No, ma'am.  I was in the -- are you talking about when he

8   told them?

9   Q   Uh-huh.  He was sitting at the table?

10  A   Yes, but I wasn't -- I mean, I was -- I was around my

11  house trying to just --

12  Q   Well, did you see it in the incident report where they

13  said he said he didn't know who shot him?

14          MR. McCREE:  And, Your Honor, that's a statement --

15  Mr. Hinton is not here, and that is an ambiguous statement, in

16  that Mr. Hinton could have meant he -- he didn't know the

17  person's name.  Mr. Hinton is not here to clarify that

18  statement.

19          MS. CASSINELLI:  Well, Your Honor, the rules don't

20  apply and it's --

21          THE COURT:  Do you know -- let me just say, do you

22  know what Mr. Hinton told police?

23  BY MS. CASSINELLI:

24  Q   At the time of the incident?

25  A   He didn't know who the guy was.

1  Q    Okay.  And your testimony is that he lived with you at

2  that residence?

3  A    My brother-in-law did previous, before that.

4  Q    Right.  And when Mr. Thomas lived across the street,

5  right?

6  A    Yes, he lived across the street.

7  Q    Okay.  Can you tell who this is?

8  A    Yeah.  That's Franklin.

9  Q    Okay.  And then, over here, we're at 11:26?

10 A    That's me.

11 Q    Do you know who these people are; is it still you?

12 A    Yes, it's still me in the yard.

13 Q    So then everybody goes back inside again?

14 A    Yeah, we go back inside.

15 Q    We saw that at the other end of the video.  Did you ever

16 invite that driver in?

17 A    No, ma'am.

18 Q    Did you wonder why he was just sitting in his car while

19 Mr. Thomas was hanging out with you all for 17 minutes?

20 A    Well, the only thing, I didn't know him, so, I mean, he

21 wasn't -- I just don't let anybody in my home.

22         THE COURT:  Why don't we stop right there.  And I'm

23 going to ask you to step down from the witness stand.

24         THE WITNESS:  Okay.

25         THE COURT:  You'll still be under oath.  And you can

                         Hartwell - Cross                          45

1   be seated in the audience.  And then we'll have another

2   hearing.  It will just take a few minutes, and then we'll call

3   you back to the witness stand.

4        (Witness steps down.)

5             THE COURT:  And, Mr. Thomas, we're going to have to

6   take a break to have another brief hearing.

7             Is it from Pulaski County?

8             THE COURTROOM DEPUTY:  Yes.

9             THE COURT:  Okay.  And Pulaski County knows that

10  someone else is going to be coming there for this hearing, and

11  you'll need to step out when that happens.  And then, you'll

12  step back in when this -- this new hearing is finished.  Okay?

13            THE DEFENDANT:  Yes, ma'am.

14            THE COURT:  So leave the line open.

15            THE DEFENDANT:  Yes, ma'am.

16            THE COURT:  Okay.

17       (Court in Recess in this case at 3:40 p.m. to hear another

18  matter on the docket.)

19                         AFTER RECESS

20       (Call to Order of the Court at 3:50 p.m.)

21            THE COURT:  Hi, Mr. Thomas.  We're back on the

22  record.  Thank you.

23       (Mr. Phillips, counsel in the other case on the docket

24  thanks the Court.)

25            THE COURT:  And we're back on the record now.

Hartwell - Cross                                        46

1   Colleen, do you need me to give you a minute?

2        THE COURTROOM DEPUTY:  I don't know if we need to get

3   Keauna.  Keauna isn't on.  We could call her.

4        THE COURT:  Oh.  Yeah.

5        Come on up, sir, and have a seat.

6     (LUTHER HARTWELL, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

7   RETAKES THE WITNESS STAND.)

8     (Various people confer in the courtroom, off the record.)

9        THE COURTROOM DEPUTY:  Keauna is on.

10       MS. SMITH:  This is a Keauna.

11       THE COURT:  Hey, Ms. Smith.  You can hear okay?

12       MS. SMITH:  Yes.

13       THE COURT:  Okay.  And, Mr. Thomas can hear us?

14       THE DEFENDANT:  Yes, ma'am.

15       THE COURT:  Okay.

16       MS. CASSINELLI:  Cameron, do you have to log in or

17  anything?

18       THE COURT:  Okay.  We're going to pick up where we

19  left off just in a sec when we get the video back up on the

20  screen.  And the witness, Mr. Hartwell, is back in the witness

21  -- on the witness stand, and you are still under oath, sir.

22       MR. McCREE:  That is the current.

23       MS. CASSINELLI:  Oh, good.  Thanks.

24     (Resume cross examination of Mr. Hartwell by Ms.

25  Cassinelli.)

1    BY MS. CASSINELLI:

2    Q    Okay.  Just to kind of get back to where we were, Mr.

3    Hartwell, do you agree with me that at the point in the video

4    where we ended and where we are now going to begin, everybody

5    has walked inside -- or, everybody, being you, Mr. Hinton, and

6    allegedly Mr. Thomas, have now walked from the car back

7    inside?

8    A    Yes.

9    Q    You don't see anybody on that screen?

10   A    No.

11   Q    All right.  We're going to start back at 12:57 or

12   10:32:58, depending on which number you're -- okay.  This is

13   about 13:32.  Do you know who that is?

14   A    (No audible response.)

15   Q    Somebody walks to the driver's side of the car, right?

16   A    Uh-huh.

17   Q    But you -- you can identify people in this video, so who

18   is that?

19   A    (No audible response.)

20   Q    In fairness, the Judge can tell, because when you look at

21   the other video, that's how you tell who is walking in and

22   out.

23        Okay.  So, we still have our person right here.  We're at

24   14:20 -- almost to 14:25.  It looks like he's walking back in

25   the house; do you agree?

1  A   Yes, ma'am.  That was Donnell.

2  Q   That was Mr. Thomas, you believe?  Okay.  Your testimony

3  earlier wasn't that he came in and out of the house three or

4  four times.  You said he came in, you spoke, and he left,

5  right?

6  A   Yes, ma'am.  I was in the back with all those ladies.  I

7  was in the back with other company, so, I mean, he was --

8  obviously, I see where he was coming back and forth.

9  Q   Well, I mean, just two minutes ago, we saw you walking

10  back and forth, right?  Okay.  So, here's more people.

11  A   That's Franklin and that's Donnell.

12  Q   Okay.

13  A   And he's getting in the car.

14  Q   Does that appear to be some kind of brake light or --

15  we're at 10:35:27, 15:28.

16  A   Franklin.  Donnell.

17  Q   Okay.  So, we just had the shooting, so that was at --

18  what did I just say, 15 -- 15 about 33-ish.  It's 10:35:23,

19  24, 25, 26, 27, 28, 29, 30 and he's running across the yard.

20  So, that's when the shooting happened, right?

21  A   Yes, ma'am.

22  Q   And that's when you were standing at the door?

23  A   No, ma'am, I was not standing at the door.  I was in the

24  house.

25  Q   Okay.

Hartwell - Cross                                                    49

1    A    Or I had just checked the door.

2    Q    That's fine.  I'm sure the Court can see the videos.

3         So, the driver never gets out of the car; is that right?

4    A    No, not to my knowledge, no.

5    Q    Okay.  You -- you never mention, or at least it wasn't

6    included in the narrative in the incident report, that you

7    went to the driver's side of the car at least twice, if not

8    three times, and spoke with the driver, right?

9    A    Well, I know I was in my yard.  I didn't know how close I

10   went to the vehicle.

11   Q    But you will agree with me that that wasn't in the

12   incident report; in fact, it didn't even mention the driver at

13   all, right?

14   A    Right.

15   Q    Mr. Hartwell, you do have some criminal history; is that

16   right?

17   A    I've been arrested, yes.

18   Q    I'm not going to go through all of it.  Don't worry.  But

19   you have some history of criminal impersonation?

20   A    Yes.

21   Q    And obstructing governmental operations?

22   A    (No audible response.)

23   Q    Thefts?

24   A    No.

25   Q    You don't think you have any thefts on your record?

Hartwell - Cross                                      50

1   A    Theft by -- not the -- probably a long time.

2   Q    Okay.  That's fair, if it was a long time ago, but you're

3   not saying -- you're not saying that you don't have any thefts

4   in your history?

5   A    Not as I know, no, I don't.

6   Q    You don't think you do?

7   A    Theft?  What do you mean?

8   Q    Do have any like any theft of property, theft by

9   receiving, a theft related offense?

10  A    Oh, okay.  Yes.

11  Q    Okay.  When Mr. Thomas lived nearby, did he -- did you

12  have a vehicle?

13  A    No.

14  Q    And you didn't have a vehicle for some time; is that

15  right?

16  A    Correct.

17  Q    And you didn't have a vehicle at this -- at the time of

18  this video?

19  A    No, ma'am.

20  Q    And, so, you got rides from people?

21  A    Yes, ma'am.

22  Q    Including Mr. Thomas?

23  A    Yes, ma'am, he has given me rides --

24  Q    Okay.  Thank you.

25  A    -- to different places.

1          THE COURT:  Mr. McCree, do you have follow up?

2          MR. McCREE:  Yes, Your Honor.

3                      REDIRECT EXAMINATION

4  BY MR. McCREE:

5  Q    Mr. Hartwell, when we met briefly before court this

6  afternoon, we didn't go through the video in great detail; is

7  that right?

8  A    No, sir.

9  Q    But before today, had you reviewed the video in detail?

10 A    Yes.

11 Q    And when you reviewed that video in detail, is that when

12 you -- you identified Mr. Thomas, or was it today when you

13 identified Mr. Thomas?

14 A    No, it was before today.

15 Q    So, you knew coming into the courtroom that it was Mr.

16 Thomas on the video?

17 A    Yes.

18 Q    And that was based on your detailed review of it?

19 A    Well, I knew that was him.  I mean, he came to my house.

20 Q    Is it fair to say, too, that you told me as well that you

21 looked at the video on my screen, and based your knowledge of

22 the evening, you knew who he was, but you could see it better

23 on your own -- your own system; is that right?

24 A    Yes.

25 Q    And have you ever had an occasion to test the different

Hartwell - Recross                                    52

1   cameras at your house to see how the time stamps match up?

2   A    No.

3          MR. McCREE:  Your Honor, I don't have anything

4   further.

5          THE COURT:  Okay.

6          MS. CASSINELLI:  Your Honor, just briefly.

7          THE COURT:  Okay.

8                       RECROSS EXAMINATION

9   BY MS. CASSINELLI:

10  Q    To be clear, your testimony -- the video doesn't show Mr.

11  Thomas, we have to rely on your testimony; is that right?  We

12  have to believe you?  Do you agree with me?

13         MR. McCREE:  Your Honor, that's more of a legal

14  question than a factual question.

15         THE WITNESS:  No, I -- I mean --

16  BY MS. CASSINELLI:

17  Q    So, it's your testimony that we don't have to believe what

18  you say, because we can see on the video clearly that it's Mr.

19  Thomas?

20  A    I mean, it shows it's Mr. Thomas.  Yeah, anybody, I would

21  think, can recognize him, I mean, when he first come to my

22  door.

23  Q    Okay.

24  A    (Indiscernible.)

25  Q    Where is Mr. Hinton?

Hartwell - Recross                                    53

1   A   I don't know.

2   Q   Did you speak to him today or yesterday or --

3   A   No, ma'am.

4   Q   -- in the last week?

5   A   No, ma'am.

6   Q   He didn't want to tell the police anything, did he?

7           MR. McCREE:  And, Your Honor, I believe this goes

8   beyond the scope of my redirect.

9           THE COURT:  I'll allow it.

10  BY MS. CASSINELLI:

11  Q   Did you and Mr. Hinton, in that time that you were waiting

12  on 9-1-1, did you all talk about it?

13  A   No, ma'am.  He was bleeding.  And he was just, I mean,

14  scared.  I mean, I was scared.  It was trying.  Didn't come

15  out before the police got there.

16  Q   Did you think the police were coming, because neither of

17  you called?

18  A   Well, I knew he was coming, because I said, "Call the

19  police."

20  Q   But the person that you said you told left already?

21  A   No, ma'am, I think the white guy who -- by the name of

22  Buck, he's the one that was on the phone talking to the

23  police.

24          MS. CASSINELLI:  May I approach, Your Honor?

25          THE WITNESS:  As you can -- as you see the video

Hartwell - Recross                                      54

1  before that, you'll see him on the videotape talking to 9-1-1.

2  BY MS. CASSINELLI:

3  Q   Where was he on that videotape?

4  A   I don't know.  If you were to forward it, you could see,

5  because he -- because I saw him.

6  Q   I've watched all of these videos.  So, where do you see

7  him?  Tell me which video and what time?

8  A   Well, right after he got -- it doesn't even show when

9  Frank ran around the back and came back to my front door, was

10 when I let him in.

11 Q   Well, there is a video of him running through the yard,

12 but that's all you can see, right?

13 A   Well, I clearly saw him just coming to my front door and I

14 let him in.  That's when I realized he was shot, he was

15 bleeding.

16 Q   And you think that's on video?

17 A   I know it was, because I --

18 Q   Well, the Court is going to have all the videos, so she

19 can look.  But, I'm going to ask you to refresh -- looking at

20 this incident report, where it recounts your interview with

21 police.

22 A   Uh-huh.

23 Q   Here, so you don't have to find the page, I'll just give

24 you that one and trade you.

25 A   I need your glasses again.

1   Q   Yes -- yes, sir.  Just at the very end of that page.

2           MR. McCREE:  What page are we looking at?

3           MS. CASSINELLI:  Five.

4           MR. McCREE:  Okay.

5           THE WITNESS:  Yes, ma'am.

6   BY MS. CASSINELLI:

7   Q   Okay.  Do you agree with me that the report reflects that

8   you told police that the -- the women -- that you told the

9   women to call police?

10  A   All I said was, "Somebody call the police."

11  Q   Okay.  But the women were gone already, right?

12  A   They were.

13  Q   We saw that on the video, right?  They were in the white

14  van?

15  A   Yes, ma'am.

16  Q   And a neighbor actually identified the white van; did you

17  know that?

18  A   Pardon me?

19  Q   Did you know that a neighbor saw the white van and police

20  investigated the white van?

21  A   I didn't know that, but the white van was at my house.  It

22  was Audrey.

23  Q   Right.  And they determined that somebody came to pick up

24  Ms. Campbell from your residence and left right before this?

25  A   And it was Audrey.  Yes.

1    Q    Thank you.

2             THE COURT:  Anything else, Mr. McCree?  Or were you

3    finished, Ms. Cassinelli?

4             MS. CASSINELLI:  Yes.  Yes, ma'am.

5             THE COURT:  Okay.  Anything else, Mr. McCree?

6             MR. McCREE:  No, Your Honor.

7             THE COURT:  Okay.  You may stand down, sir.  And

8    unless anybody has an objection, I'll allow the witness to

9    leave.

10        (Witness steps down.)

11            MS. CASSINELLI:  No objection.

12            MR. McCREE:  No objection, Your Honor.

13            THE COURT:  Okay.

14            MR. McCREE:  But I believe he may just stay, we have

15   paperwork to do.

16            THE COURT:  Okay.  Well, he's welcome to stay.

17            MR. McCREE:  For his vouchers.

18            THE COURT:  He doesn't have to leave.  He's welcome

19   to stay.  Or if you want to go ahead and get that done, that's

20   fine too.

21            MR. McCREE:  If I could have two minutes with him,

22   just to --

23            THE COURT:  Yes, you can.

24            MR. McCREE:  -- so we can get him on his way?

25            THE COURT:  You can.

1      (Witness excused.)

2      (Mr. McCree and Mr. Hartwell leave the courtroom to attend

3  to paperwork.)

4      (Mr. McCree returns to the courtroom.)

5          MR. McCREE:  Judge, may I have one more moment?  I

6  forgot that I have Mr. Hartwell's phone.  I'd like to give it

7  to him back, if that's okay.

8          THE COURT:  No problem.

9      (Mr. McCree leaves the courtroom to give Mr. Hartwell his

10 phone.)

11     (Mr. McCree returns to the courtroom.)

12         MR. McCREE:  Thank you, Your Honor.

13         THE COURT:  Okay.  Do you have any other witnesses to

14 call?

15         MR. McCREE:  No, Your Honor.

16         THE COURT:  Okay.  Any other evidence --

17         MS. CASSINELLI:  Yeah, you do.

18         MR. McCREE:  Actually, I'm sorry, Your Honor, I do

19 have Keauna Smith.

20         THE COURT:  Okay.  Ms. Smith?

21         MS. SMITH:  Yes, Your Honor.

22         THE COURT:  Mr. McCree is calling you as a witness.

23 And I'm going to ask Ms. DuBose to swear you in on the phone.

24         THE COURTROOM DEPUTY:  Is she on the phone?  Okay.

25         THE COURT:  So.

Smith - Direct                                              58

1      (KEAUNA SMITH, GOVERNMENT'S WITNESS, SWORN.)

2                       DIRECT EXAMINATION

3   BY MR. McCREE:

4   Q    Ms. Smith, could you state your name for the record,

5   please?

6   A    Keauna Smith.

7   Q    Where are you employed?

8   A    I am employed at U.S. Probation and Pretrial Services.

9   Q    And are you familiar with the Donnell Thomas who is named

10  as the defendant in this action?

11  A    Yes.

12  Q    And are you familiar with the petition to revoke his

13  supervised release that was filed in his case?

14  A    Yes.

15  Q    And standard number -- excuse me -- violation number 3

16  speaks about a variety of missed monthly supervision reports.

17  Are you aware of whether Mr. Thomas did or did not submit

18  reports for the months that are listed in the petition?

19  A    He did not submit reports for October and November -- yes,

20  those months, yes.

21  Q    So, October, November, and December of 2019, and then

22  January through July of 2020?

23  A    Correct.

24  Q    And did Mr. Thomas -- did he have to appear for a urine

25  specimen on October 28th, 2019?

Smith - Cross                                    59

1   A    Yes.

2   Q    Did he appear for that?

3   A    No, he did not.

4            MR. McCREE:  Nothing further, Your Honor.

5            THE COURT:  Ms. Cassinelli, anything?

6            MS. CASSINELLI:  Thank you, Your Honor.

7                       CROSS EXAMINATION

8   BY MS. CASSINELLI:

9   Q    Ms. Smith, have you been supervising Mr. Thomas since he

10  was released?

11  A    Yes.

12  Q    Okay.  And do you remember talking to me on the phone

13  about a week ago?

14  A    Yes.

15  Q    Actually, a week and a half now?

16  A    Yes.  Yes.

17  Q    Okay.  Let's talk about the monthly supervision reports.

18  Mr. Thomas did actually submit October, November, and December

19  of 2019, they were just a little late; is that right?

20  A    No, I don't have those reports.

21  Q    Do you remember talking to me on the phone and looking it

22  up and telling me that you spoke with him, and I think maybe

23  assisted him and -- and filed the reports late?

24  A    I didn't get the report -- no, those were his other

25  reports.

Smith - Cross                                        60

1  Q   Oh, I'm sorry.  Tell me which reports.  You told me that

2  they were through the end of 2019.

3  A   What report, what, that he --

4  Q   Okay.  So, when we spoke on the phone, you told me that he

5  submitted all the reports for the fall of 2019, that they were

6  late, that I think you all -- you spoke to him about it, and

7  they were late?

8  A   Some of them were late up until September.  And I did have

9  the one from September 2019, yes.

10  Q   So, when you looked through your file and told me that you

11  had October, November, and December, you were in error?

12  A   That's a possibility, because I don't remember saying

13  those exact months.

14  Q   Okay.  What about 2020, have you -- when was the last time

15  you spoke to Mr. Thomas about filing the monthly reports?

16  A   The last time I talked to Mr. Thomas about filing reports

17  were in October of last year.

18  Q   Oh.  So, you haven't gotten a report since September and

19  you haven't spoken to him about that?

20  A   Not that I can recall.

21  Q   Do you remember Mr. Thomas talking to you about having

22  difficulty getting the electronic reports submitted?

23  A   I do not, but that is a possibility.

24  Q   Okay.  Let's go to the drug testing.  How was he notified

25  of the need to submit a urine specimen on October the 28th of

1  2019?

2  A   He was supposed to call Code-A-Phone, the drug testing

3  line.

4  Q   Okay.  So -- so, are you saying that he just failed to

5  call in and see if he was supposed to take a drug test that

6  day?

7  A   Yes, he failed to call in and it's resulting in him

8  failing to report for the test.

9  Q   Okay.  So, it was like a maybe he would have one, maybe he

10  would not.  Has he ever had a positive drug screen?

11  A   No.

12  Q   In fact, you took him off of Code-A-Phone in December,

13  right?

14  A   Let me verify that.  Yes, it was in December 2019.

15  Q   And so, you only do that for people that you have little

16  concern about drug use, right?

17  A   Only do what?

18  Q   You don't take people off the Code-A-Phone if you're

19  concerned about they're potentially using drugs?

20  A   Well, if they're on it (indiscernible, feedback on

21  recording), and they stay on, say, for three months, and

22  (indiscernible, feedback on recording) they will complete the

23  Code-A-Phone testing.

24  Q   Right.  So that's designed to include people who have

25  problems staying clean, right?

```
                        Smith - Cross                        62
```

1  A    Correct.

2  Q    You go through phases, and sort of after you finish all

3  the phases, it's presumed that you're doing good and you don't

4  need to be calling in for drug testing?

5  A    You don't need to be on Code-A-Phone, but you can be

6  randomly drug tested.

7  Q    Right.   Okay.   But, Mr. Thomas hasn't shown you

8  indications of drug use since his release?

9  A    No.

10 Q    And he's complied with all other conditions of release

11 since that time as well; is that right?

12 A    Yes.

13 Q    He's maintained employment?

14 A    Yes.

15 Q    In fact, I don't think he's gone more than two weeks being

16 unemployed through this entire time period?

17 A    I'm not exactly -- I'm not sure of the exact time period.

18 Q    Does that sound right though?   You never had to get on him

19 about getting job?

20 A    No.

21 Q    And he's lived with his wife and children through this

22 whole time period; is that right?

23 A    To my knowledge, yes.

24 Q    Okay.   And he's -- well, that's it.   Thank you.

25 A    Okay.

1          THE COURT:  Any follow up?

2          MR. McCREE:  No, Your Honor.

3          THE COURT:  Okay.  Thank you, Ms. Smith.

4          THE WITNESS:  Thank you, Your Honor.

5     (End of Ms. Smith's testimony.)

6          THE COURT:  Any other evidence you wish to offer, Mr.

7    McCree?

8          MR. McCREE:  And this time I'm going to mean it.  No,

9    Your Honor.

10          THE COURT:  Okay.  Very good.

11          Ms. Cassinelli, do you have any evidence that you

12    would like to offer?

13          MS. CASSINELLI:  Yes, Your Honor.  I want to say I

14    think Mr. Thomas is going to testify.  I had anticipated that

15    his wife would, but she has -- is both holding down a 50-plus

16    hour a week job and managing four children, and it was just a

17    burden for her today.  And so, I'm going to call Mr. Thomas,

18    but I have advised Mr. Thomas, against his desires, that he

19    will not be testifying about the underlying incident, that he

20    will assert his Fifth Amendment privilege, because otherwise I

21    would be, you know, derelict in my duties.  So, but there are

22    plenty of things that he would like to address with the Court

23    outside of that.

24          THE COURT:  Okay.  Mr. Thomas, my Courtroom Deputy is

25    going to swear you in, so you need to raise your right hand.

Thomas - Direct                                                          64

1          THE DEFENDANT:  Yes, ma'am.

2       (DONNELL A. THOMAS, DEFENDANT HEREIN, DEFENDANT'S WITNESS,

3    SWORN.)

4                          DIRECT EXAMINATION

5    BY MS. CASSINELLI:

6    Q   Hi, Mr. Thomas.

7    A   How you doing?

8    Q   I'm okay.  Let's talk about, you heard Ms. Smith's

9    testimony, right?

10   A   Yes, ma'am.

11   Q   Okay.  So, let's start there.  Is she correct, you've had

12   no violations that you've been notified of?

13   A   I've been notified of no violations.

14   Q   So you had no idea that there was a drug test that you

15   supposedly missed or failed to call in?

16   A   No, ma'am.  She had told me that -- she had gave me a date

17   that I was getting off the Code-A-Phone, and the last thing

18   that she told me was before the date that they're talking

19   about that I missed.  I have no knowledge that I even missed a

20   drug screen, because if I did, why would they even let me off

21   the Code-A-Phone.

22   Q   Okay.  Right.

23   A   I didn't hear any of that until just now.

24   Q   Okay.  But -- okay.  And how about the reports?  Why --

25   why were you not submitting reports?

1   A    She had called and told me that I had missed, I think,

2   like three months, so --

3   Q    Okay.  Wait.  Time out.  Time out.  I don't know if you

4   can see me.  Time out.  You're going really fast, so kind of

5   slow down a second.  Okay?

6   A    Okay.

7   Q    The judge is trying to hear.  I'm trying to hear.  When --

8   A    She --

9   Q    What is your time frame; is this like last fall you're

10  talking about?

11  A    Yes, ma'am.

12  Q    Okay.  So would this be the -- the reports that she was

13  talking about for like July, August, and September?

14  A    Yes, ma'am.

15  Q    Okay.  So go ahead and tell us.

16  A    Called and she told me that I had to fill those out.

17  Q    Okay.

18  A    So, she told me to come up there.  And when I had got up

19  there, she gave me them forms to fill out and turn back in.  I

20  did that.  And then --

21  Q    Okay.  So, that's what you did for July, August, and

22  September?

23  A    Yes, ma'am.

24  Q    Okay.

25  A    And then she told me about this site on my laptop where I

1  could do the rest of them at home.  So, I was doing them at

2  home, and I thought I was submitting them, and by nobody not

3  saying nothing to me, I didn't know that it was not going

4  through.

5  Q   Okay.  So, you were submitting them online, or at least

6  you thought you were submitting them online?

7  A   On my laptop.

8  Q   And so, when was the first time you learned that those

9  weren't -- weren't being received by the Probation Office?

10  A   Right now.

11  Q   Or when this all came up, right?

12  A   Yeah, right.  Yeah.

13  Q   Okay.

14  A   Yeah, when this all came up, that's the first time --

15  first time I ever heard about it.

16  Q   Okay.  Other than that -- well, not really other than

17  that.  You've had no other issues on supervision, right?

18  A   No, ma'am.

19  Q   All right.  Let's talk about where you live and with whom.

20  Actually, just tell me who you live with?

21  A   I live with my -- I live with my wife and my four kids.

22  Q   Okay.  And how old are the four children?

23  A   Seven, four, 12, and seven months.

24  Q   Okay.  And were you recently married?

25  A   Recently, I got married last year.

1   Q    Last year -- let's see, when were you -- so you -- you got

2   home around April the 1st of last year; is that right?

3   A    Yes, ma'am.

4   Q    And you got married maybe in June?

5   A    Yes, ma'am.

6   Q    Okay.  And have you been employed?  Were you employed when

7   you were arrested?

8   A    Yes, ma'am, I was.

9   Q    And tell us, for how long did you have this job?

10  A    I had this job right here like six/seven months, because

11  my other job just laid everybody off.

12  Q    Okay.  And where was the job that you've had for the last

13  six months?

14  A    At Arkansas Pediatric Complex Care.

15  Q    Arkansas Pediatric Complex Care?

16  A    Yes, ma'am.

17  Q    Okay.  What is that?

18  A    I work with disabled kids.  I got to -- I got to help feed

19  them.  I got to help change them.  I got to help wipe them.

20  And I got to pick them up, put them in they wheelchairs, and

21  lay them back down.  I got to -- you know, I kind of help kids

22  that's unable.

23  Q    So, are you like a care giver or a like a tech or a -- is

24  it an institutional facility kind of thing?

25  A    It's -- yes, ma'am, it is.  It's a institutional facility.

1  And I think it's funded by the state.  It's North Little Rock

2  and it's -- yeah, it's disabled kids --

3  Q    Okay.

4  A    -- that can't --

5  Q    I'm sorry to interrupt you.  Were you -- did you have to

6  be trained for this position?

7  A    Yes, ma'am, I did.

8  Q    What kind of training?

9  A    It was like CNA training, like they had to teach us how to

10  feed the kids, they had to teach us how to lift the kids and

11  put the kids down properly, had to show us if we're fixing to

12  -- fixing to change the diaper, how to reposition the child --

13  Q    How long -- how much --

14  A    -- and --

15  Q    How long did this training take?

16  A    Three weeks.

17  Q    Okay.  You heard the testimony earlier.  Did you ever live

18  on Lonsdale Circle?

19  A    Did I ever live on Lonsdale Circle?

20  Q    Yes.

21  A    Yes, ma'am, I did.

22  Q    Okay.  So, just to be clear, this -- the shooting that

23  you're alleged to have participated in, is on Lonsdale Circle,

24  right?

25  A    Yes, ma'am.

1   Q   And you used to live across the street from Mr. Hartwell's

2   residence?

3   A   Yes, ma'am, I did.

4   Q   How long ago was that?

5   A   It had to be a little bit over a year.  It's been a long

6   time.

7   Q   Okay.  Around a year.  Okay.  And you live in a different

8   house now, right, with your wife?

9   A   Yes.  Yes, ma'am.

10  Q   Okay.  Do you work full time?

11  A   Yes, ma'am, I do.

12  Q   40 hours a week?

13  A   Yes, ma'am, I do.

14  Q   And do you usually work in the evenings?

15  A   I work 2:00 to 10:30 at night.

16  Q   Okay.  Is that a hard 10:30?

17  A   Yeah, I'm tired.

18  Q   And what about your wife, what does she do?

19  A   My wife, she -- she's the general manager at -- she's

20  general manager at two Taco Bells.

21  Q   Okay.  So, she works quite a bit?

22  A   Yes, ma'am, she works 12 hour shifts.

23  Q   Okay.  Over 50 hours a week?

24  A   Yes, ma'am, she does.

25  Q   And are the kids in public schools, or what?

Thomas - Direct                                          70

1   A    No, ma'am.  Right now, they're being home schooled --

2   Q    So your wife --

3   A    -- due to the pandemic.

4   Q    So, your wife and her mother are trying to coordinate with

5   the kids all day with you gone?

6   A    Yes, ma'am.

7   Q    Okay.  Mr. Thomas, I want to ask you about your tattoos.

8   A    Yes, ma'am.

9   Q    It's hard to see on here because the screen is messed up,

10  but do you have tattoos on your arms?

11  A    Yes, ma'am, I do.

12  Q    Are they covered in tattoos?

13  A    No, ma'am, they're not.

14  Q    Are they close to it, like you've got them all up and down

15  right here?

16  A    Yes, ma'am, I do.

17  Q    And on your neck right here?

18  A    Yes, ma'am, I do.

19  Q    Have you seen the videos?  You said you have, right?

20  A    Yes, ma'am, I -- yes, ma'am.

21  Q    Okay.

22          MS. CASSINELLI:  And we're not going to go into any

23  details of that event, except I need to probably say this for

24  the record, and I don't know if I should proffer this or he

25  should say it, but he has appeared and pled not guilty, but

1    hasn't been formally charged yet, so.

2              THE COURT:  I'll accept that from you.

3              MS. CASSINELLI:  Okay.

4    BY MS. CASSINELLI:

5    Q    Mr. Thomas, if this Court decides to release you, do you

6    think you could get your job back despite having been in

7    custody for a week?

8    A    Yes, ma'am, I do.

9    Q    Why?

10   A    Because I have a good rapport with all my managers there.

11   I was never late.  I always do overtime when they call me.

12   And I have a good rapport with all of the kids.  They love me.

13   Q    And do you also have a good rapport with your boss?

14   A    Yes, ma'am, they always tell me that I do a great job.

15   And every time they call me for overtime, I'm there.

16   Q    Okay.  If this Court releases you, will you abide by any

17   conditions the Court feels is necessary, which might include a

18   home confinement or monitor or anything like that?

19   A    Anything to get me where I can take care of my family, I

20   will provide that, any rules.

21   Q    Okay.  Thank you.

22             THE COURT:  Mr. McCree, any cross examination?

23             MR. McCREE:  No, Your Honor.

24             THE COURT:  Okay.  All right.  That will complete

25   your testimony, Mr. Thomas.

1          Ms. Cassinelli, do you have other evidence that you

2   would like to offer?

3          MS. CASSINELLI:  No, Your Honor.

4          THE COURT:  Okay.

5          MS. CASSINELLI:  Oh, yes, I do.

6          THE COURT:  Okay.

7          MS. CASSINELLI:  I forgot one question.  May I?

8          THE COURT:  You may.

9          MS. CASSINELLI:  Thank you.

10  BY MS. CASSINELLI:

11  Q   Mr. Thomas, I'm going to show you a photo.  And that's

12  black and white, this one is colored, but I don't know why

13  it's turned this way.  Can you tell me what this is?

14  A   That is a Ford, that is my vehicle.

15  Q   This is the vehicle that you owned as of May 14th?

16          MR. McCREE:  And, Your Honor --

17          THE WITNESS:  Yes, ma'am, it is.

18      (End of Mr. Thomas's testimony.)

19          MR. McCREE:  -- Your Honor, I'm going to object that

20  if Mr. Thomas is not going to speak about the shooting, he

21  shouldn't speak about the shooting, or he should be subject to

22  cross examination about the shooting.

23          MS. CASSINELLI:  We're not speaking about the

24  shooting.  He's just telling you what car he drove.

25          MR. McCREE:  So, I would object to the car being

1    relevant then.

2              MS. CASSINELLI:  How would it not be relevant?

3              MR. McCREE:  How is his car relevant, Your Honor, if

4    it's not about the shooting?

5              MS. CASSINELLI:  Well, he's not giving any statement

6    about the shooting.

7              MR. McCREE:  Except about his car.

8              THE COURT:  I understand.

9              MS. CASSINELLI:  Well, he's not saying anything about

10   his car.

11             THE COURT:  I understand.

12             MS. CASSINELLI:  He's just simply saying this is his

13   car.

14             MR. McCREE:  It doesn't matter unless it's about the

15   shooting.

16             THE COURT:  It -- it's going to go to whether his car

17   was there that night, I'm assuming.

18             MS. CASSINELLI:  But he's still not giving any

19   statements, because I can't --

20             THE COURT:  I understand.

21             MS. CASSINELLI:  -- I mean, you know, as much as he

22   wants to, I can't let him do that.

23             THE COURT:  Very good.  I weigh -- I will see what

24   the argument is when we finish, but, I mean, I think -- I

25   agree with Mr. McCree, if you're going to use the picture to

1  argue that it's -- it is or isn't in the video, then --

2          MS. CASSINELLI:  Well, frankly, I intended to have

3  his wife identify it, but she couldn't get free from the kids

4  and the job.  So, I mean, I would ask that the Court consider

5  it as is.  I'll submit it myself.  I mean, I think it's

6  relevant.  And I -- I think -- I honestly --

7          MR. McCREE:  Your Honor, I --

8          MS. CASSINELLI:  -- think that the rule allows him to

9  testify at this hearing and it not be admissible in a later

10  proceeding, but I don't know how firm that is and how far that

11  would go with the state court, and I don't know who is going

12  to represent him, and so I'm not taking that risk.

13          THE COURT:  I -- I understand.  Well, I'll just say,

14  I will consider -- well, I want to hear what you're going to

15  argue first.  And if that's his car, that's his car.  But if

16  it was or wasn't there is not particularly relevant to me,

17  because if he was there, he may not have been in his car.

18          MS. CASSINELLI:  Right.

19          THE COURT:  So, I don't know that it's particularly

20  relevant.  I'll just -- I will say I'll give it the relevance

21  that I think it deserves.

22          MS. CASSINELLI:  Sure.

23          THE COURT:  And we'll go from there.

24          MS. CASSINELLI:  Okay.  Thank you.

25          THE COURT:  I'm ready to hear argument from the

1    parties.

2             MR. McCREE:  Your Honor, and I think given that this

3    is a preliminary hearing as well as a bond hearing, I think

4    fundamentally the burden is with the Government as far as the

5    proof on the probable cause of the -- the violations.

6        Concerning the fairly technical ones, the Government would

7    just submit that there is testimony from the Probation Office

8    that those reports in violation 3 were not submitted, and that

9    for whatever reason they -- they weren't submitted, they

10   weren't done and done on time.

11            As far as the missed urine specimen on October 28th,

12   I think that even if the excuse is, "I didn't know I was

13   supposed to call in," the testimony again was that he was

14   given notice that he was supposed to call Code-A-Phone and he

15   failed to do that.  That's his own failure.  And that's not an

16   excuse for missing a urine specimen.

17            And on the more substantial violation, the Government

18   would submit that there is testimony from Mr. Hartwell, who

19   was on the scene the evening that Mr. Hinton was shot.  Mr.

20   Hartwell came and he testified, he identified Mr. Thomas based

21   on his review of the video.  Mr. Hartwell was clear that

22   although today he looked at the video for a brief time, both

23   with me before court and with me during court and with Ms.

24   Cassinelli during court, he looked at the video in more -- in

25   more detail before.  He knows Mr. Thomas.  He's seen him

1  before.  They had been neighbors for a period of time.

2         Although you can't see his face, Mr. Hartwell was

3  there that evening.  He knew who Mr. Hinton was speaking with.

4  The shooting happened a few minutes after the three of them

5  had been together.

6         And then, also, I think just simple logic will say

7  that when police came to the scene that evening, Mr. Hartwell

8  immediately said, "There is video at my house."  Pulled the

9  video.  That's why we have the video.

10         And, so, if Mr. Hartwell is trying to lie or shade

11  about who it was that shot Mr. Hinton, then you're not going

12  to have this video very early.

13         And also, the -- you know, there's some suggestion

14  that it's the driver who shot Mr. Hinton, and not Mr. Thomas.

15  Again, the video doesn't show the driver getting out of the

16  car.

17         Mr. -- Mr. Hartwell was very consistent today in

18  looking at the video and saying, "That's Mr. Thomas.  That's

19  Mr. Hinton.  That's me."  Mr. -- Mr. Hartwell knows, based on

20  his experience that night and his review of the video

21  previously and today, who it is he's looking at.  He was very

22  consistent, even without me going through the video with him

23  to help him prepare for his testimony today.  And in some

24  places, that made it a little bumpy because he didn't remember

25  whether Mr. Thomas came in or out of the house a few times

1  while Mr. Hartwell was entertaining people at his home.

2          He may not have remembered that, but to the essential

3  point, he knew who it was in that scene when the flash is

4  fired.  He knows who it was when his cousin is running through

5  the yard.  He knows who it is who was chasing him with an

6  object in his hand.

7          He may not be able to tell you what type of gun that

8  it was, but he can tell you that his cousin was bleeding,

9  needed hospital attention.  And he also can tell you that in

10  that video you can see that there's an individual holding an

11  object that looks like a gun and he's chasing Mr. Hinton.

12          And because Mr. Hartwell is here, he's testifying

13  about it, I believe the Court can judge his credibility for

14  itself, but I would submit that his testimony is something

15  that the Court can rely on in good faith in knowing that Mr.

16  Thomas was the shooter that evening.

17          And we would submit that that element of the petition

18  is -- is covered by Mr. Hartwell's testimony, and this should

19  move forward to a final revocation hearing.

20          And similar to that, if the Court believes that there

21  is evidence that Mr. Thomas was the shooter that evening, he's

22  a danger to the community, and there is a serious risk that

23  there could be another incident between now and the time of

24  the revocation hearing.

25          He had this job at the time, and I think it's even

1  more concerning that if he's the shooter, he's involved with

2  children, and who knows, where did this come from?  Like

3  there's no reason why this even happened.  There was a

4  shooting.  We don't know why.  And if you believe that he's

5  the shooter, he is someone that is -- the Government is

6  concerned about his dangerousness if he's released.

7          And, so, we would ask that he be detained pending his

8  bond revocation hearing.

9          THE COURT:  Thank you.

10         Ms. Cassinelli?

11         MS. CASSINELLI:  Thank you, Your Honor.

12         Mr. McCree just said there is no reason why this

13  shooting even happened.  And that's important.  There is no

14  reason.  He didn't give a reason.  Nobody has given any

15  reason.

16         But, what we do know is the only thing that Mr.

17  Hartwell was consistent about was that he -- that it was Mr.

18  Thomas.  He wasn't consistent about anything else that

19  happened.  He wasn't consistent or even truthful about what he

20  was doing.

21         Obviously, they don't want to say who the driver is.

22  And he admitted that he didn't tell the police any of that.

23  There's no mention of somebody named Buck.  Like no interviews

24  with any of those people.  I mean, this is a whole new set of

25  information.  And you watched the video and you can't square

1    it with what he says.

2           What really happens is that they all go in and out

3    several times, and he stands by the car and talks to the

4    driver for several minutes, and I think twice.  And you can

5    see it.  Like I mentioned, if you watch who is walking across

6    the yard, and then they come in on the other video, and go to

7    the car at the same time.

8           Mr. Hartwell told you that he didn't see the shooting

9    but he knows who did it because he can identify Mr. Thomas in

10   the video.  He couldn't really decide which way he was

11   supposed to go on that, like is he supposed to say that he

12   could see it from the video or is he supposed to say it's

13   because he was there and he knew who was running in the yard?

14          But, ultimately, he said he can tell.  And, Judge, I

15   implore you to look at that video.  I have looked at it.  My

16   clerks have looked at it and frozen it.  We've done everything

17   that we can do, and even in the very best moment, you cannot

18   say that that is Mr. Thomas.  In fact, Mr. Thomas is covered

19   in tattoos and you don't see those tattoos on that video.

20          There is nothing but Mr. Hartwell's unreliable word.

21   Mr. Hinton, who is supposed to be the victim, doesn't show up.

22   He tells the police he doesn't know who shot him.

23          That's just not enough to lock up Mr. Thomas, who

24   has, by all accounts, done pretty well on release.  Like,

25   yeah, we can, you know, complain about some reports, but we

1   don't lock people up for not submitting their monthly reports,

2   particularly when the Probation Office hasn't addressed that

3   with them, and they don't even know.  And the drug test, there

4   is no indication that he would have intentionally missed a

5   drug test.  He's never tested positive.  And they took him off

6   of Code-A-Phone, he was such a not drug risk.  So, that

7   doesn't seem like a reason to revoke his supervised release

8   and lock him up, especially right now.

9          He has maintained employment.  He has an excellent

10  job.  His wife is just stretched as thin as she can possibly

11  be right now and so confused about what's going on, because,

12  you know, they're running around like crazy people trying to

13  take care of four kids, both having 50-plus hour a week jobs.

14  And nobody has got any time to be out there shooting at

15  people.

16         And the fact that we don't have any reason for that

17  is troubling.  Like, we literally just have this guy coming in

18  and saying it's him that shot his cousin, after they sat at a

19  table in the kitchen for how ever long it took for police to

20  get there.  He's not even sure who called the police.  But I

21  can tell you that if my brother-in-law or sister-in-law got

22  shot, I'd be on the phone with the police right then.

23         You know, I'd also be saying who that driver was and

24  that I had been in and out of the house and telling the truth

25  about all that.

1   There's a reason he's not telling the truth.  And I

2   think the reason is, is because it's a drug deal gone bad,

3   involving two people that don't have anything to do with Mr.

4   Thomas.

5   But Mr. Thomas has a history with Mr. Hartwell,

6   because they were old neighbors.  You heard Mr. Hartwell talk

7   about how he couldn't really decide if they were friends, and

8   he came over a lot, or not, you know, like he didn't really

9   know where he should go with that.  And that's because they're

10  not friends.  They're not friends at all.  That's why he

11  couldn't describe that and couldn't make sense of that.

12  He never mentioned to anyone that Mr. Thomas

13  supposedly came over some other time that day.  That's -- no

14  one has ever heard that before.

15  So, I submit to you that we should not take away Mr.

16  Thomas's freedom, at least pending a full hearing, just based

17  on that testimony and -- and nothing else.

18  The video, I mentioned the tattoos, the story, the

19  car is, you know -- I didn't know if they were going to say --

20  try to say that was his car or not.  It's clearly not his car.

21  I don't know whose car it is because we don't know who the

22  driver is because Mr. Hartwell won't tell us.

23  You can't see the source of the shot in the video.

24  There's like all this -- everybody wants to infer that it was

25  from the passenger's seat, but I've watched it a zillion times

1  and I can't tell where that shot comes from.  I mean, it's a

2  blurry video.  You can -- you see like a tiny pow.

3          And, you know, the -- the idea that Mr. Hartwell just

4  didn't have a chance to look at all this video in detail

5  should be dismissed outright.  Like, he was there, you know,

6  so he either remembers the events or he doesn't.  And his

7  testimony was completely and totally inconsistent with what we

8  know the events to have been, because we can see the video.

9          And, you know, yeah, he said, "I have a video."

10  Great.  I'm sure he's seen it before and knew that you are not

11  going to be able to identify a human being on those videos.

12  Just no way.

13          So, you know, I would, Judge, ask you to give Mr.

14  Thomas some leeway here and let him resume his life.  He's --

15  he's done very well.  We can put him on conditions that are

16  sufficient.

17          There is no indication of violence.  He had a drug

18  case.  He was in the BOP for a drug case.  And he's one of our

19  successes until this moment.  There is no indication that he's

20  violent, that he has exhibited a proclivity to be violent.  No

21  one has come in here and told you anything about it except Mr.

22  Hartwell and this incident, and that is not reliable enough to

23  lock him up.

24          So, please, Your Honor, I ask you to formulate some

25  conditions that -- that will allow Mr. Thomas to go home to

1  his family.

2          THE COURT:  Okay.  Thank you.

3          MR. McCREE:  Your Honor, may I respond, one brief

4  moment?

5          The suggestion that this was a drug deal gone bad,

6  actually I think that if that is the cause of why Mr. Hartwell

7  was somewhat confused -- I'll admit that there were some

8  places where he was confused, but I would say that's more so

9  someone coming in fresh off the street, not knowing all the

10 details of the video that -- that's hours long.  But if it is

11 a drug deal gone bad, and Mr. Thomas is there, that's a reason

12 why this is a problem, because you have a drug dealer who is

13 involved in a shooting, and that's all the more reason why

14 he's a danger and should be locked up.

15         MS. CASSINELLI:  Your Honor, no, that's not what I

16 meant at all.  I meant that Mr. Hartwell and Mr. Hinton are

17 involved -- and you can look at their criminal history and see

18 clearly that they're involved in things like this -- they were

19 involved in a separate drug deal that didn't have anything to

20 do with Mr. Thomas and they're not about to say who else was

21 involved.  They had had interactions with Mr. Thomas within a

22 day, and they don't get along.

23         THE COURT:  Okay.

24         MR. McCREE:  And I don't believe there was any

25 testimony about them not getting along, Your Honor.

1          THE COURT:  I understand.

2          As to the preliminary hearing, I find that there is

3    probable cause for the motion to revoke to be valid.

4          MS. CASSINELLI:  Yes, Your Honor.

5          THE COURT:  So, that's my finding with regard to the

6    preliminary hearing.

7          With regard to the bond hearing, the defense has the

8    burden of proving by clear and convincing evidence that the

9    defendant won't flee, and I don't think that's an issue here,

10   or that he will not pose a danger to any other person or the

11   community.  And, so, the question is, have you met the burden

12   of proving that by clear and convincing evidence?

13         And I recognize that Mr. Hartwell, there are some

14   inconsistencies with what he told the police and what he

15   testified to here today.  I don't know the basis for those

16   inconsistencies, maybe -- and there could be various

17   explanations for that.

18         Mr. Hinton is not here.  We don't know anything about

19   Mr. Hinton.  We know he didn't identify the shooter.  We know

20   Hartwell did identify the shooter.  And I'm assuming he

21   identified Thomas as the shooter when he met with police.

22         MR. McCREE:  Yes, Your Honor.

23         THE COURT:  I'm assuming that he did.

24         Okay.  I looked at the videotape, the specific time

25   and the issue where the shooting occurred, and obviously it is

1  hard to tell what's going on.  I -- it was hard -- it was hard

2  for me to tell what was going on.

3        I had to weigh that, the testimony of Mr. Hartwell,

4  against the fact that Mr. Thomas has, by all account, done

5  pretty well on release.  He's employed.  He's not had any

6  problems.  He hasn't tested positive for drugs.  He's got a

7  wife.  He's got kids.  He's taking care of them.  And is --

8  has a good relationship with his employer, and his job would

9  be available to him.

10        I'm just -- I'm just not prepared to say today that

11  he should be locked up until his hearing.  I'm just not going

12  to -- I'm not going to do that.

13        But I am going to impose some conditions that I

14  expect you to follow, Mr. Thomas.  I think there's just too

15  many questions --

16        THE DEFENDANT:  Yes, ma'am.

17        THE COURT:  -- about the shooting.  I think there's a

18  lot more to what happened that night, that a lot of blanks

19  need to be filled in, and I'm not going to -- I don't want to

20  assume anything about what was going on that night and who was

21  involved.  I think there just needs to be a lot more developed

22  before that can be decided.

23        So, based on my concerns about the evidence in the --

24  in the shooting case itself, I'm going to -- I'm going to

25  allow Mr. Thomas to leave pending his -- his bond hearing --

1    not his bond hearing, his revocation hearing.

2           And maybe by the time of the revocation hearing,

3    there will be more information that is developed about the

4    nature of the case, maybe there will be charges filed, maybe

5    there won't.  But, I suspect there will be more information

6    available to both sides at that time.

7           So, I'm going to -- Mr. Thomas, I'm going to allow

8    you to be released, and the conditions that you have for your

9    supervised release will remain in effect, but I'm also -- I'm

10   going to add a couple of conditions to that.

11          One, you may not have any contact with Mr. Hinton or

12   Mr. Hartwell or any person who was present at Mr. Hartwell's

13   house on May 14th, 2020 or any individual who could be a

14   witness in this case.  Do you understand?

15          THE DEFENDANT:  Yes, ma'am, I do.

16          THE COURT:  Okay.  Also, I'm going to order that you

17   be placed on home detention, and that means that you are to be

18   at home with certain exceptions, and those exceptions include

19   you are authorized to go to work and home, you're authorized

20   to go to religious services, you're authorized to come to

21   court proceedings, you're authorized to meet with your

22   attorney.  And there are other condition -- other locations

23   that you will be allowed to go to if your Pretrial -- not

24   Pretrial -- Probation Officer approves of those in advance.

25   And, so, the most important thing about this condition is

1    you've got to communicate with Ms. Smith.

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  And you've got to keep in touch with her,

4    because if you don't, then we're looking at a problem down the

5    road.

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  I'm going to require that you have

8    location monitoring and that you follow the requirements of

9    home detention.  But, you've just got to tell Ms. Smith -- and

10   she's going to visit with you about this after you're released

11   -- you're going to have to tell her, "Here is my schedule for

12   work.  Here are the times I'm at work."  And if for some

13   reason you're not there when you're supposed to be, or you're

14   at home when you're supposed to be at work, vice-versa, she's

15   going to report that to us.

16             THE DEFENDANT:  Yes, ma'am.

17             THE COURT:  So, it's very important that you comply

18   with these -- this home detention.  But she'll go over that

19   with you in detail.

20             I'm going to order that you pay the cost of it if you

21   are able to do so.  And I will let Ms. Smith make that

22   determination, whether your employment income is sufficient to

23   allow that.

24             So, that's going to be my ruling.

25             I'm going to -- Ms. Smith, does he need to come meet

with you after he gets out?

MS. SMITH:  Yes, Your Honor, (indiscernible, feedback on recording) location monitoring, we can go to (indiscernible, feedback on recording), but I also need to make sure that we have equipment.

THE COURT:  Okay.  All right.  And I'll authorize you to do either the ankle monitor or the -- what's it called, virtual?

MS. SMITH:  Virtual.

THE COURT:  Virtual monitoring.

MS. SMITH:  Yes, ma'am.

THE COURT:  Okay.  You can -- it's your choice about which of those to do.

Okay.  So, I'll enter an order this afternoon authorizing the release.

And then, Mr. Thomas, you need to get with Ms. Smith and get that all set up in the next -- you probably won't be able to do it today, but, tomorrow, first thing in the morning.  Okay?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  All right.  I hope -- I don't know if there is a -- if there is a hearing yet on the motion to revoke, but --

MS. CASSINELLI:  I don't know, and I should say -- I'm sorry to interrupt you.

1      THE COURT:  -- hopefully, one will be set soon.

2      MS. CASSINELLI:  I should say, before he gets off the

3  phone, first of all, don't hang up, Mr. Thomas.

4      THE DEFENDANT:  Okay.

5      MS. CASSINELLI:  He still has a state bond to post.

6  I actually forgot to tell you.  It's only 7,500 dollars.  So,

7  he actually will be in there -- I mean, they may get a

8  bondsman tonight, but --

9      THE COURT:  Okay.

10      MS. CASSINELLI:  -- he actually won't be released

11  until that bond is posted.

12      THE COURT:  Fair enough.  Okay.  All right.

13      MR. McCREE:  And, Your Honor, I think that the final

14  hearing is October 15th, I believe, at 10:00.

15      THE COURT:  Oh, okay.  Okay.  Very good.  Well, so,

16  these conditions will be imposed through until your final

17  hearing.  And at that point, Judge Baker will make a

18  determination about whether you should be revoked and, if so,

19  what the consequences will be.

20      THE DEFENDANT:  Okay.

21      THE COURT:  So, you've got about a little less than a

22  month of -- of these new conditions.  Okay?

23      THE DEFENDANT:  Thank you, ma'am.

24      MS. CASSINELLI:  Your Honor?

25      THE COURT:  Yeah.

1           MS. CASSINELLI:  Just so that I don't have to bother

2  you later, I'm going to need a transcript of this or of his

3  testimony.

4           THE COURT:  Okay.

5           MS. CASSINELLI:  What's the best way to go -- some of

6  the -- some of the Magistrates want me to just contact their,

7  you know, assistants and to get the recording, and then

8  sometimes they want me to go through the whole process, so

9  what is your preference?

10          THE COURT:  I have no preference.  If you want just

11 the -- I mean, Colleen can get you a disk of the recording.

12 If you want it to be transcribed, she can -- I guess one of

13 the Court Reporters here does that?

14          THE COURTROOM DEPUTY:  We send it off.

15          MS. CASSINELLI:  I'll just call you.

16          THE COURT:  Yeah.

17          THE COURTROOM DEPUTY:  Okay.

18          THE COURT:  Just get with her.

19          MS. CASSINELLI:  Just heads up.

20          THE COURT:  She knows about how to do this a lot more

21 than I do.

22          MS. CASSINELLI:  Yeah.  And, I mean, it's just

23 different every time and I get so lost in it.  Okay.  Thank

24 you.

25          THE COURT:  Okay.  Court is in recess.

1          MR. McCREE:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3      (Adjournment at 4:49 p.m.)

4          ELECTRONIC SOUND RECORDING CERTIFICATION:

5  I, court approved transcriber, certify that the foregoing is a

6  correct transcript from the official electronic sound

7  recording of the proceedings in the above-entitled matter.

8

9  /s/Robin Warbritton                October 7, 2020
   Signature of Approved Transcriber    Date

10

11 Robin Warbritton
   Typed or Printed Name

12

13

14

15

16

17

18

19

20

21

22

23

24

25